# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7109 | **DATE** | 9/7/2001 |
| **CASE TITLE** | Glenn E. Griffin vs. Larry G. Massanari | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. The Commissioner's motion for summary judgment (doc. # 10) is denied; the plaintiff's motion for summary judgment (doc. # 8) is granted. The Court therefore reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 U.S.C. : 405(b). This case is terminated.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 13 2001 | |
| | Docketing to mail notices. | date docketed | 15 |
| | Mail AO 450 form. | CM | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | 9/7/2001 | |
| mm | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GLENN E. GRIFFIN,                )
                                 )
    Plaintiff,                   )
                                 )    00 C 7109
vs.                              )    Magistrate Judge Schenkier
                                 )
LARRY G. MASSANARI,              )
Commissioner of Social Security, )
                                 )
    Defendant.[1]                )

## MEMORANDUM OPINION AND ORDER[2]

The plaintiff, Glenn Griffin, seeks judicial review of a final decision by the Commissioner ("Commissioner") of the Social Security Administration ("the Agency") denying his application for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI"), pursuant to 42 U.S.C. § 405(g).[3] Mr. Griffin seeks summary judgment reversing the Commissioner's decision denying his claim for DIB and SSI or, in the alternative, remanding the case to the Commissioner for further proceedings (doc. # 8). The Commissioner has filed a cross-motion for summary judgment in his favor (doc. # 10). For the reasons stated below, the Court denies the Commissioner's motion for summary judgment, grants the motion of Mr. Griffin, and remands this case.

---

[1]Mr. Massanari, the Acting Commissioner of Social Security, is substituted as defendant in place of William A. Halter, the previous Acting Commissioner, pursuant to Fed. R. Civ. P. 25(d)(1).

[2]By the parties' consent, on July 6, 2001, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment (doc. ## 12, 13, 14).

[3]The regulations governing DIB and SSI claims are designated by different regulation numbers, but the content of those regulations is the same for purposes of this opinion. For convenience, the Court will use the DIB regulation numbers or 20 C.F.R. Part 404, rather than 20 C.F.R. Part 416, to refer to both claims.

## A.     Procedural History.

On January 26, 1999, Mr. Griffin filed an application for DIB and SSI, alleging a disability onset date of September 13, 1998, due to pain in his right wrist and arm, an inability to use his right hand, and pain in his left shoulder (R. 95, 109, 301). In his application, Mr. Griffin claimed that these conditions resulted from an automobile accident on September 13, 1998 (R. 109, 304). Mr. Griffin also claimed mental depression caused by constant pain and an inability to use his right hand (R. 132). On April 2, 1999, the Commissioner denied Mr. Griffin's application initially, and on September 7, 1999, the Commissioner denied the application on reconsideration (R. 65-70; 73-75; 304-12). On January 27, 2000, Mr. Griffin appeared with counsel and testified at an administrative hearing before an Administrative Law Judge ("ALJ") (R. 25-57). The ALJ issued a decision on February 17, 2000, denying Mr. Griffin's claim for benefits (R. 14-22). The ALJ found that Mr. Griffin's impairments, while severe, did not rise to the level of a legal disability, and that Mr. Griffin retains the residual functional capacity ("RFC") to perform a limited range of light work existing in substantial numbers in the national economy (R. 21).

On September 8, 2000, the Appeals Council denied review of the ALJ's decision, making this the final decision of the Commissioner and subject to judicial review by the district court. *See Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994). On November 14, 2000, Mr. Griffin filed his complaint in federal court seeking reversal or remand of the Commissioner's decision.

## B.    Factual Background.

Mr. Griffin was born on December 17, 1966 (R. 29, 95).  Mr. Griffin's formal education ceased when he dropped out of school during the tenth grade; he did not thereafter obtain a GED (R. 30).  Mr. Griffin never married (R. 95), but he has a minor son whom he sees every other weekend (R. 95).  Mr. Griffin is right-handed (R. 29)

He has not worked since September 13, 1998, the date he sustained an injury to his right forearm in a motor vehicle accident (R. 95, 109).  Beginning in March 1998, until the accident, Mr. Griffin worked for Hinckley & Schmitt ("Hinckley"), a water distribution company (R. 37-38, 118-19).  He was a production worker who drove a truck and operated a forklift (R. 119).  At Hinckley, Mr. Griffin frequently lifted up to 50 pounds, and performed frequent stooping, crouching and handling of large objects (bottles of water weighing in excess of 20 pounds) (R. 37-38, 119).  Prior to that, Mr. Griffin worked as a packer for Turtle Wax Company, where he  had to lift and stack boxes weighing 20 to 25 pounds (R. 35, 120).  Mr. Griffin also worked as an unloader for RPS Roadway, where he was required to lift up to 150 pounds (R. 34-35).  He then worked as a cook, a dishwasher, and a cook supervisor in a restaurant (R. 31-33, 122).  As a cook, Mr. Griffin was required to lift and carry between 15 and 40 pounds of equipment; as a supervisor, he was not required to lift or carry "much" but he was still required to stand up to do that job (R. 32-33).  Mr. Griffin also worked as an unpacker at United Parcel Service, where he was required to lift between 35 and 75 pounds (R. 30-31),  and as a maintenance worker, where he was required to lift up to 25 pounds (R. 124).

3

## C. Medical Evidence.

On September 13, 1998, Mr. Griffin was a passenger in a serious motor vehicle accident (R. 141-42). He was hospitalized at Cook County Hospital ("CCH") for ten days due to injuries he sustained in the accident, namely, fractures to the radius and ulnar of his right forearm, and broken ribs – which injured his lungs (R. 141, 146, 189). Once Mr. Griffin's physical condition stabilized, Dr. Gregory Portland operated on his right arm, attaching screws and metal plates to secure the broken bones in Mr. Griffin's right arm (R. 189-90). Mr. Griffin was discharged from the hospital on September 23, 1998 (R. 141).

However, on September 28, 1998, Mr. Griffin returned to CCH complaining of pain that made it difficult for him to sleep (R. 234). CCH medical personnel examined Mr. Griffin's right arm and reported that there had been progress in healing (R. 234). In October 1998, X-rays of Mr. Griffin's right forearm showed good bone alignment (R. 239).

On November 5, 1998, the cast on Mr. Griffin's arm was removed, and the examination revealed a limited range of motion at his wrist (R. 233). In the following months, X-rays of his right forearm continued to show good alignment and healing of the fracture (R. 236-238). Nonetheless, Mr. Griffin reported continued pain and limited mobility in his right hand (R. 228-31). A CCH physician prescribed physical therapy, attendance at a pain clinic and pain medication (R. 229, 232).

In March 1999, despite X-rays showing good healing, a CCH doctor noted that Mr. Griffin's right arm and hand were hypersensitive to palpation, had reflex sympathetic dystrophy,[4] calcification

---

[4] "Reflex sympathetic dystrophy" is an abnormal condition marked by pain, sweating, swelling, skin atrophy (withering), and redness or paleness caused by a disturbance of the sympathetic nervous system. J.E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER ("DICTIONARY"), at R-67 (Matthew Bender & Co., Inc. 28th ed. 1995 & Supp. 2000).

consistent with early synostosis,[5] and callus formation at the radius fracture site (R. 228-29). In April and May 1999, Mr. Griffin visited James Lambur, M.D. of the Parkview Orthopaedic Group for consultation regarding problems with his right hand and forearm, as well as difficulties with the left shoulder (R. 270-73). Dr. Lambur noticed some calcification at the level of Mr. Griffin's right arm fracture, however, he did not diagnose synostosis (R. 270). Dr. Lambar reported that the supination[6] of Mr. Griffin's right forearm was approximately 30 degrees from neutral, and pronation[7] approximated the same; flexion of the hand and wrist was within normal limits, except for an old injury affecting his right 4th finger, and difficulty with the flexion of the right thumb (Id.). Dr. Lambar noticed hypesthesia[8] along the terminal portion of the course of the radial superficial cutaneous nerve. He reported notable limitation of the range of motion of Mr. Griffin's right forearm. The exam of Mr. Griffin's forearm revealed some tenderness along the scar over the middle and terminal portions of the radius, and the tenderness over the distal ulna; there was also some prominence of the distal ulna (Id.).

With respect to Mr. Griffin's complaints of pain in the left shoulder, Dr. Lambar noted the patient's inability to comfortably abduct[9] without some degree of weakness and notable discomfort; however, the external rotation was within normal limits (Id.). Dr. Lambar considered the "possibility

---

[5]"Synostosis" is the union of two or more bones by a bony growth. *Id.* at S-447.

[6]"Supination" is a rotating movement of the upper and lower limbs. With regard to the right arm or hand, it is the movement used in tightening the lid of a jar. *Id.* at S-395.

[7]"Pronation" is a movement of the upper or lower limbs. With regard to the right upper limb, it is the movement which unscrews the lid of a jar. *Id.* at P-472.

[8]"Hypesthesia" is a decreased sensitivity of the skin and decreased sensitivity to stimulation. *Id.* at H257-58.

[9]"Abduct" means to pull or draw away a part of the body, as a limb, from the axis of the trunk or from the imaginary median line which runs through the center of the body, or from the side of the body. *Id.* at A-18.

of rotator cuff injury to the left shoulder" (*Id.*). He recommended the active and aggressive physical therapy of the right forearm. And, although the MRI taken subsequent to the exam was normal, Dr. Lambar concluded that Mr. Griffin sustained a contusion to his left arm, and he recommended a steroid compound to alleviate pain and discomfort (*Id.*).

In May 1999, Mr. Griffin sought treatment from Dr. Luke for the fracture and pain in his right arm (R. 271). Dr. Luke examined Mr. Griffin, and observed that his right hand and wrist flexion were within acceptable limits, with the exception of some limitations affecting his right fourth finger and thumb (*Id.*). However, Dr. Luke noticed the scarring of Mr. Griffin's tendons and contemplated an "occult injury."[10] Dr. Luke noted some early bone changes, and he recommended that Mr. Griffin engage in more physical therapy. At the same time, Dr. Luke recommended against removal of the hardware in Mr. Griffin's right arm, and suggested that Mr. Griffin use anti-inflammatory medication in case of no improvement (*Id.*).

Three months later, Mr. Griffin still complained of pain, soreness and an inability to use his right hand (R. 241). On August 5, 1999, Dr. Ghanim Kassir conducted a physical examination of Mr. Griffin at the request of the Agency (R. 241-47). Dr. Kassir noticed no clubbing, cynosis or edema in Mr. Griffin's extremities; and there was no hypertrophy of the joints, ulcerations or varicosities (R. 242). Dr. Kassir described Mr. Griffin's right forearm scar, and noted diffuse, moderate soft tissue swelling which involved the dorsal surface of the right hand and right forearm (*Id.*). Although there was no redness, Dr. Kassir reported that the limitations of Mr. Griffin's right hand included: dorsiflexion – limited to 20 degrees; palmer flexion – limited to 30 degrees; and fist

---

[10]An "occult" injury is one that is obscured, concealed, or otherwise not evident. DICTIONARY at O-19.

and grip strength of 5/5 in the left hand and 0/5 in the right hand. Mr. Griffin was not able to oppose the thumb to the other fingers of the right hand, and was not able to pick up a pencil, or sip and button with the right hand. His left hand examination did not display any finger or manipulative limitations (R. 243). Dr. Kassir diagnosed Mr. Griffin with severe weakness of the fist and grip of the right hand, and mild diffuse soft tissue swelling of the dorsum of the right hand and right forearm, which could be caused by reflex sympathetic dystrophy (*Id.*). At the same time, a radiologist – Dr. L. Garcia – reported that X-rays showed a healed fracture in the right forearm and wrist (R. 246). However, there was moderate arthritis and angulation in the right forearm (*Id.*), and moderate osteoarthritis with joint narrowing and minimal marginal spurs in the left shoulder (R. 247).

In addition to the physical examination, Mr. Griffin underwent a psychiatric evaluation by Dr. Harley G. Rubens to assess his complaints of mental depression (R. 248-50). Dr. Rubens found no evidence of hallucinations, delusions, or disorganization of thought (R. 249). Mr. Griffin's memory was good; and his attention and concentration were adequate (R. 250). However, Dr. Rubens diagnosed Mr. Griffin with adjustment disorder,[11] disorder of mood and conduct, and with dependent personality disorder.[12] Dr. Rubens explained that when Mr. Griffin felt anxious or depressed he regressed, allowing others (especially women) to support and take care of him (*Id.*). Dr. Rubens added that Mr. Griffin did not display signs of major depression, psychosis or cognitive impairment (*Id.*). Two weeks later, another Agency reviewer, Dr. Mohan Singh assessed the

---

[11]"Adjustment disorder" is an inability to adjust or to cope with an environmental stress (such as illness or loss of a job) without developing symptoms, such as depression, anxiety, disturbance in behavior, etc. DICTIONARY at A-160.

[12]"Dependent personality disorder" is an abnormal condition marked by a feeling of helplessness when alone or when comforting relationships end. *Id.* at D-65.

findings of Dr. Rubens, and he found no evidence of any major psychiatric disorders or organic mental impairments from the accident (R. 259-60).

On August 21, 1999, a different Agency reviewer, Dr. Young-Ja Kim issued a Physical Residual Functional Capacity Assessment of Mr. Griffin (R. 251-58). The reviewer found Mr. Griffin exertionally capable of performing the following physical acts: occasionally lifting or carrying 20 pounds; frequently lifting or carrying 10 pounds; and standing, walking or sitting for a total of about 6 hours in an 8-hour workday (R. 252). Dr. Kim also opined that Mr. Griffin was limited in his ability to use his upper extremities, and he had no use of his right hand; however, the use of the left hand was normal (*Id.*).

On September 16, 1999, slightly over a year after the injury, Mr. Griffin reported to CCH with complaints of persistent pain in his right forearm (R. 287). He visited the hospital again in November 1999 and January 2000, still complaining about persistent right arm pain (R. 284-86). Mr. Griffin received prescriptions for Neurontin and Elavil to relieve his pain (R. 291-93). In November 1999, Mr. Griffin received an injection for the pain (R. 286). Despite this medical treatment, Mr. Griffin reported to a doctor in January 2000 that he continued to feel pain and that the injection only provided him relief for approximately 8 hours immediately after the injection (R. 285).[13] Mr. Griffin refused further injections because they hurt too much and provided too little relief (R. 40-41; 285). The last dated medical report in the record is dated January 20, 2000, but it is illegible.

---

[13]In his testimony before the ALJ, however, Mr. Griffin stated that this injection provided him with relief for only 2-3 hours – not 8 hours (R. 40).

**D.    The Administrative Hearing.**

*1.     Mr. Griffin's Testimony.*

At the administrative hearing, the ALJ focused his questions to Mr. Griffin on his physical condition, how that affected his daily life, and how it differed from his previous physical abilities when he was working.  Mr. Griffin offered the following relevant testimony.

Mr. Griffin testified that he lives with his sister in her apartment, but he pays no rent, and does no household chores because his pain will not permit him to do anything except  occasionally make a sandwich, use the washroom, and sit watching television from 3:00 a.m. in the morning until 12:00 midnight (R. 50-51).  Mr. Griffin indicated that the pain makes him unable to sleep, and this is why he spends so much time awake, sitting "or rocking." (*Id.*).  He does not cook, sweep the floor, or do laundry or grocery shopping, because those activities require two hands; instead, Mr. Griffin's sister does those chores for him (R. 49-50).  Mr. Griffin said he becomes dizzy due to the pain medications he is taking, and is thus afraid to drive a car since the accident (although he still has a license) (*Id.*).

Mr. Griffin also testified that he can hold a pencil between the thumb and index finger of his right hand, and he can dress himself slowly, using buttons and zippers (R. 44).  Mr. Griffin stated, however, that he is unable to lift or carry objects in his left hand (R. 56-67), and there is constant pain in his right forearm and left shoulder (R. 56-57), which becomes worse in colder temperatures (R. 46), or when making a fist (R. 45).

To control the pain, Mr. Griffin testified that he takes Neurontin and Tylenol 3, by prescription (R. 46), but those medications make him dizzy and lightheaded (R. 48). Mr. Griffin also reported that the injections he received for the pain offered him relief for only "two to three hours"

and he would not recommend such a shot to his "worst friend" because it hurt too much (R. 40). Mr. Griffin attends the CCH pain clinic once every two weeks (*Id.*).

2.   *The Testimony of the Vocational Expert.*

A vocational expert ("VE") testified at the hearing, answering the ALJ's hypothetical questions based on Mr. Griffin's age, education, and vocational background (R. 58). In his initial hypothetical, the ALJ assumed an individual who: could lift and carry ten pounds; stand or walk for two hours in an eight-hour day and sit for six; pull or push up to ten pounds; had no functional use of his dominant right hand and arm, but could grip a pencil in his right hand and do limited writing; and had a limited range of motion in his left shoulder (*e.g.,* he could not raise this arm beyond his head) (*Id.*). In response, the VE offered the opinion that such an individual could not do Mr. Griffin's past relevant employment (*Id.*). When asked whether such a person could do any jobs, the VE testified that there is a "very, very limited range of jobs available" (*Id.*). For example, the VE testified that there are about 3,000 information clerk positions and 1,500 positions as a TV security guard available in the Chicago metropolitan area, and in excess of ten times this number (re: the guard position) on a national scale (R. 59). The VE also testified that the positions of information clerk and TV security guard did not require any extended writing, except that "an incident report may require more than that hypothetical allows" with respect to the individual's RFC (R. 60).

Subsequently, the ALJ modified his hypothetical, increasing the individual's ability to stand or walk from two to six hours (R. 60). The VE responded that such modification would open an additional 800 positions as an usher; 4,000 positions as a walking security guard; and between 200 to 300 positions as a doorkeeper (*Id.*).

On cross-examination, Mr. Griffin's attorney asked the VE to add an additional limitation, namely that the claimant would be periodically dizzy or lightheaded as a result of taking the pain medication and would therefore lose concentration (R. 61). The VE testified that if the hypothetical individual were suffering at least two one-half hour lapses in concentration each day due to the side-effects of medication, such as dizziness or lightheadedness, in addition to the time given to him for normal breaks and lunch, then all of the jobs that he previously said the claimant could perform, given his already limited RFC, would be eliminated (*Id.*). The VE testified that these jobs would also be eliminated if the claimant had to miss work at least once a week due to pain (*Id.*). In his final word, the VE excluded the prospect of "competitive employment" for a person who, due to the side effects of pain medication, becomes lightheaded each time pain medication is ingested, or at least three times a day (R. 62).

## E. The ALJ's Decision.

The ALJ determined that Mr. Griffin met the disability insured status requirements and would continue meeting them through March 31, 2001 (R. 20). The ALJ's decision followed the standard five-step sequential evaluation assessment outlined in 20 C.F.R. § 404.1520(a) and § 416.920(a) (2001).

At the first step, the ALJ found that Mr. Griffin had not engaged in any substantial gainful activity since September 13, 1998 (R. 20). At step two, the ALJ found that Mr. Griffin has medically determinable severe impairments of the right forearm ulnar and radius with open reduction and internal fixation, and bone marrow edema in glenoid process of the left shoulder, which meet the definition of "severe" (*Id.*). At step three, the ALJ determined that Mr. Griffin does not have an impairment or combination of impairments contemplated in the regulatory listings (*Id.*). At step 4,

11

the ALJ determined that Mr. Griffin has an exertional RFC that would permit him to perform a limited range of light work, since he can lift or carry up to 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours in an 8 hour work day; sit 6 hours in an 8 hour day; and push or pull up to 20 pounds. And, although the ALJ found that Mr. Griffin is unable to use his right dominant hand and arm, and has a limited range of motion in the left arm, he also found that Mr. Griffin can hold a pencil and do limited writing (R. 21 (Finding Nos. 5, 7)). In light of this RFC, the ALJ found at step 4 that Mr. Griffin was not capable of performing his past relevant work.

At step 5, however, the ALJ found Mr. Griffin not disabled because he has the exertional RFC necessary to perform a limited range of light work in the Chicago area, namely, the jobs listed by the VE such as security guard, usher and information clerk. To make this step five determination, the ALJ found Mr. Griffin's complaints of disabling pain "not fully credible" (R. 17, 20). In discounting Mr. Griffin's testimony of disabling pain, the ALJ stated only that by using the "guideline set forth in 20 C.F.R. 416.929, 404.1529 and Social Security Ruling 96-7p, the Administrative Law Judge finds the claimant's statements regarding symptoms and resulting limitations not fully credible" (R. 17). The ALJ did not explain either how application of the guideline led to this credibility determination, or which particular statements of Mr. Griffin he found not credible (R. 17-19).

## II.

In order to establish a "disability" under the Social Security Act (the "Act"), a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can . . . be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 423(d)(1)(A)(2001). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2001). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either step 3 or 5. A negative answer at any step other than step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1 through 4, after which the burden of proof shifts to the Commissioner at step 5. *Id.* In cases of severe impairment, the ALJ's analysis at step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron*

*v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2001), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing

*Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

## III.

At step 5 of the sequential determination, the ALJ found that Mr. Griffin was not disabled because he could perform jobs that exist in significant numbers, both in the Chicago metropolitan area and the national economy. The ALJ made this determination based on the VE's testimony that Mr. Griffin, with his RFC, could perform the jobs of doorkeeper, security guard, usher and information clerk.

Mr. Griffin challenges this determination on two grounds. *First,* he argues that the ALJ did not follow the SSA's pain evaluation regulations, and improperly discounted Mr. Griffin's testimony of disabling pain, in violation of the minimal articulation standard. *Second,* Mr. Griffin contends that the ALJ did not properly evaluate his mental impairments and also failed to document, either in a Psychiatric Review Technique Form ("PRTF") or in his decision that he followed the prescribed procedure for evaluating mental impairments codified in the current version of 20 C.F.R. §

404.1520(a). For the reasons that follow, the Court finds that the ALJ's decision must be reversed and remanded.

## A. The ALJ's Credibility Finding.

The parties do not dispute that Mr. Griffin has the physical or exertional residual functional capacity to perform a limited range of light work, as defined by the social security regulations (Pl.'s Mem. at 8; Def.'s Mem. at 7-8) – and rightly so, since the RFC assessment by Dr. Kim provides substantial and uncontroverted medical evidence supporting the ALJ's finding concerning Mr. Griffins's physical capabilities.[14] But the lead issue in this case is whether Mr. Griffin has the RFC to perform that limited range of work in spite of the pain he claims and the physical side effects of the medication he takes to control that pain.

In this case, there is some objective medical evidence to support Mr. Griffin's claims of pain. For example, in March 1999, CCH doctors reported that Mr. Griffin suffered from pain in the right forearm and diagnosed "reflex sympathetic dystrophy" – a condition that can reasonably produce pain (R. 229). And, although a subsequent assessment by Dr. Lambur in April 1999 did not indicate reflex sympathetic dystrophy (R. 274), Dr. Kassir, the Agency's own examiner, found evidence of a pain related weakness in Mr. Griffin's right forearm and some soft tissue swelling, which he found could be caused by reflex sympathetic dystrophy (R. 243). Moreover, since his arm surgery in September 1998, Mr. Griffin has consistently sought pain treatment from the CCH pain clinic, in addition to prescription pain medicine and an injection to relieve the pain. In addition, there are

---

[14]"Residual functional capacity" is how much an adult can do despite his impairment. *Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999). "Light work" involves (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects. 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10.

medical reports indicating the Mr. Griffin has complained of increasing pain in his right forearm, wrist and hand since the surgery (R. 229, 231, 241-44, 246-54, 285, 287).

In cases like this one, where the objective medical evidence might support a finding in favor of the claimant, the ALJ cannot "merely ignore the claimant's allegations" but must examine all of the evidence and at least minimally articulate the path of reasoning that leads the ALJ to reject the medical evidence that favors the claimant. *Zurawski,* 245 F.3d at 887-89. SSR 96-7p specifically requires the ALJ to offer "specific reasons for the finding on credibility, supported by the evidence in the case record, and . . . sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p. Where the decision is devoid of reasoning that charts a path from the evidence to the ALJ's conclusion – as is the case here (on multiple levels) – a reversal and remand is required by the case law, the regulations and SSR 96-7p.

In this case, the medical evidence may be inconclusive regarding pain (although the ALJ never offers that explanation), but if so, the ALJ was required to make a credibility determination and, in doing so, to analyze the pain Mr. Griffin claims to experience in accordance with various factors enumerated in 20 C.F.R. § 404.1529. *See Zurawksi,* 245 F.3d at 887 (quoting *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir. 1994)).[15]

ALJ offered no explanation for his finding that Mr. Griffin's complaints of pain were not "fully credible" (R. 17, 20 (Finding No. 4)). The ALJ merely summarized the claimant's testimony, without offering any analysis of it (R. 17-19). And, in the section of his opinion where he made

---

[15]These factors include daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; and the type, dosage, effectiveness and side effects of the medications taken to relieve the pain.

express findings and offered analysis of the evidence, the ALJ never expressly tied his credibility conclusion to any specific evidence in the record (R. 19-22). Nor did the ALJ offer any analytical bridge between the evidence and his conclusion so that the Court would have a basis upon which to review and assess whether the credibility determination was supported by substantial evidence or, conversely, was patently wrong.

If all an ALJ had to do was recite a claimant's testimony and then conclusorily reject it, with a reference to the governing regulation, the minimal articulation requirement would be a dead letter. But the Seventh Circuit has made clear that it is not. The ALJ failed to provide the analysis of the material evidence regarding Mr. Griffin's complaints of pain that is required by the case law and Social Security Ruling 96-7. *See Zurawski,* 245 F.3d at 887-89 (written decision must provide "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits"). *See also Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000); *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir. 2000); 20 C.F.R. § 402.35(b) (Social Security Rulings such as SSR 96-7 are binding absent invalidity -- and there is no issue here of invalidity).

The ALJ's failure to offer a rationale is material because the credibility findings are central to the step 5 decision regarding whether Mr. Griffin has the RFC to perform a limited range of light work. The VE testified that if Mr. Griffin was unable to concentrate or became so dizzy that he would have to miss work for one hour each day or a single day each week, in addition to normal breaks, then the already limited range of light work that Mr. Griffin could perform with his exertional limitations would be entirely eliminated (R. 61-62). Mr. Griffin testified that his inability to concentrate and his dizziness are a direct result of the pain and the pain medications he takes to

control his pain.  There is medical evidence to support Mr. Griffin's consistent complaints of such

pain and objective medical evidence that would allow one to find such complaints credible, given

Mr. Griffin's physical conditions, which the ALJ found to be severe at step 3.  If Mr. Griffin's

allegations of pain and the medicinal side effects he experiences had been found credible, the VE's

testimony that there are no jobs that Mr. Griffin could perform would provide substantial evidence

for a finding of disability.  Given this testimony, the ALJ was required at least to minimally explain

why he found Mr. Griffin's complaints of pain and the side-effects from the pain medications "not

fully credible."  The ALJ here failed to do so.[16]

The Court is mindful that the ALJ's credibility determinations are ordinarily given great

deference, and they will not be overturned unless "patently wrong." *Powers v. Apfel,* 207 F.3d 431,

435 (7th Cir. 2000).  This standard, however, presumes that the evidentiary and analytical basis for

the ALJ's credibility determinations is explained in the decision, so that the Court can determine

whether it is supported by substantial evidence or, if not, whether it is patently wrong.  Without any

minimal articulation by the ALJ regarding why he did not find Mr. Griffin's complaints of pain

credible, the Court cannot affirm the ALJ's decision, because we cannot trace the path of his

reasoning. *See Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir. 1996).  The Court has "no authority to

supply a ground for the agency's decision" that is not expressly provided for in the ALJ's decision

– even if such a ground may exist based on the evidence. *O'Connor v. Sullivan,* 938 F.2d 70, 73 (7th

Cir. 1991).  Accordingly, the ALJ's decision must be reversed and remanded on that basis.

---

[16]In fact, the ALJ in this case did not even go as far as the ALJ did in *Zurawski,* in attempting to meet the
relevant standards.  In *Zurawski,* the ALJ stated that he found the claimant's complaints of pain not credible due to
inconsistencies in the record between the objective medical evidence and the claimant's daily activities.  The Seventh
Circuit reversed and remanded the case for further explanation of what the ALJ found inconsistent.  See *Zurawski,* 245
F.3d at 883-90.  Here, the ALJ says nothing about why he does not find the claimant "fully credible."

**B.      Mr. Griffin's Mental Impairments.**

Mr. Griffin also argues that the case must be reversed and remanded because the ALJ failed to consider the cumulative impact of Mr. Griffin's mental -- or non-exertional -- limitations as well as his exertional RFC on his ability to do a limited range of light work.  The Court agrees.

The case law and the regulations require the ALJ "to consider the combined effect of all of the claimant's ailments regardless of whether any such impairment, if considered separately, would be of sufficient severity" to warrant a disabled finding. *Clifford*, 227 F.3d at 873 (quoting 20 C.F.R. § 404.1523).  In "Finding No. 5" the ALJ determined that Mr. Griffin has the RFC to "perform the physical exertion requirements of work," with significant limitations comprising lifting, standing, and sitting, and with no functional use of his right dominant arm (R. 21).  This determination led the ALJ to conclude in "Finding No. 7" that Mr. Griffin has the RFC to perform a limited range of light work (*Id.*).  The ALJ, however, did not make any mention of or any determination regarding Mr. Griffin's alleged non-exertional limitations (namely, depression or lack of concentration), and the effect of those non-exertional limitations on his RFC for light work.

When non-exertional limitations are present, the ALJ has the burden of establishing by "reliable evidence" that non-exertional limitations do not significantly limit the range of work permitted by the claimant's exertional limitations. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In determining whether there is "reliable evidence" the Court must assess whether the ALJ determined "in a responsible manner" whether non-exertional impairments would interfere with the type of jobs the claimant can perform at an exertional level. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982).  Having elicited the testimony of a vocational expert, the ALJ was not entitled to simply ignore significant portions of it.  The VE clearly stated that significant lapses in

concentration (up to one hour in length each day) in addition to the need for normal breaks and lunch would eliminate the range of light work Mr. Griffin had the exertional capacity to perform (R. 57-58). Depression and lack of concentration are considered non-exertional limitations; and an ALJ is required to consider this non-exertional limitation as part of the mix in determining at step 5 what jobs a claimant can perform.

Perhaps the ALJ treated the lack of concentration claim as derivative of Mr. Griffin's claim of pain, and that the claim of lack of concentration thus failed because the ALJ found the complaints of pain "not fully credible"; or, perhaps the ALJ found the lack of concentration claim was not plausible in view of Dr. Rubens's assessment that Mr. Griffin's attention and concentration were "adequate." As to the depression, maybe the ALJ found that while this might be a natural response to the diminished use Mr. Griffin suffers in his right hand, it is not limiting. Perhaps the ALJ chalked up Mr. Griffin's mental state as being "angry at the world" for his misfortune, with that anger being expressed through – as Dr. Singh described it – a "chip -on-shoulder" attitude (R.260).

The problem is that we do not know what the ALJ thought, because he did not tell us. The ALJ did not expressly consider the non-exertional limitations claimed by Mr. Griffin: depression and lack of concentration. Without such a discussion, the Court cannot determine or review whether these non-exertional limitations would affect Mr. Griffin's RFC at step 5, in accordance with the regulations. *See, e.g.,* 20 C.F.R § 404.1520. This failure is a reversible error, because the ALJ must provide an adequate explanation why he believes the claimant can still perform a limited range of light work with his exertional residual functional capacity, taking into account any alleged non-exertional limitations. *See Corder v. Halter,* No. 00 C 2714, 2001 WL 477210, * 12 (N.D. Ill., May 4, 2001) (citation omitted); *Bapp v. Bowen,* 802 F.2d 601, 603-06 (2d Cir. 1986)).

For his part, the Commissioner does not argue that the ALJ made any findings with respect to Mr. Griffin's mental condition – because he cannot. Instead, the Commissioner simply points to the evidence in the record which could support a finding that Mr. Griffin did not suffer from any severe mental impairments that would constitute non-exertional limitations on his exertional RFC (*e.g.,* Dr. Rubens' report indicated that Mr. Griffin had no problems with attention and concentration). After summarizing this evidence the Commissioner argues that "the ALJ could rationally conclude that Plaintiff had no significant limitations . . . ." (Def.'s Mem. at 12).

Although the ALJ might have rationally reached the conclusion advocated by the Commissioner, he did not do so in any way that was articulated and can be reviewed. Because this Court cannot fill in the gaps left by the ALJ, this case must be reversed and remanded for the Commissioner or the ALJ to attend to that task at the administrative level.[17] On remand, the ALJ should properly evaluate and, at least minimally articulate, the evidence of any non-exertional limits Mr. Griffin may have, and what effect – if any – they have on his ability to work.

---

[17]In reversing and remanding the ALJ's decision, the Court notes that there is recent case law indicating that an ALJ is not required, as Mr. Griffin claims, to evaluate a claimant's mental condition by using a PRTF form. *See Godbey v. Apfel,* 238 F.3d 803, 810 (7th Cir. 2000) (in cases of mental disorder court need not remand the case so that ALJ can compile standard document and attach to decision). Moreover, under revised regulations that took effect on September 20, 2000, the ALJ is no longer required to complete the standard document. 20 C.F.R. § 404.1520 (2001).

## CONCLUSION

The Commissioner's motion for summary judgment (doc. #10) is denied; and, the plaintiff's motion for summary judgment (doc. # 8) is granted. The Court therefore reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 U.S.C. § 405(b). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated:  September 7, 2001







# United States District Court
## Northern District of Illinois
### Eastern Division

DOCKETED

SEP 1 3 2001

Glenn E. Griffin

v.

Larry G. Massanari

**JUDGMENT IN A CIVIL CASE**

Case Number: 00 C 7109

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that The Commissioner's motion for summary judgment (doc. # 10) is denied; the plaintiff's motion for summary judgment (doc. # 8) is granted. The Court therefore reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to Sentence IV, 42 U.S.C. : 405(b).

Michael W. Dobbins, Clerk of Court

Date: 9/7/2001

Mervin Myvett, Deputy Clerk